UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

VRAIMENT HOSPITALITY, LLC,

       Plaintiff,

v.                        CASE No. 8:11-CV-1240-T-33TGW

TODD BINKOWSKI, et. al.,

       Defendants.

_____

## REPORT AND RECOMMENDATION

The plaintiff owns and operates two successful Amelie's Bakery & Café restaurants in North Carolina. The plaintiff contends that, after a joint venture with the defendants to replicate Amelie's restaurant in Tampa failed, the defendants continued to use Amelie's name, recipes, and décor, in violation of the Lanham Act, Florida's Uniform Trade Secrets Act, and other laws. The plaintiff has filed a Motion for Preliminary Injunction (Docs. 2, 51), seeking to prohibit the defendants from using its intellectual property pending trial.

Because much of the alleged infringing conduct has ceased, and the plaintiff has not shown a substantial likelihood of prevailing on what remains at issue, I recommend that the plaintiff's motion for preliminary

injunction be denied. This conclusion is also supported by a balancing of the harms.

I.

The plaintiff, Vraiment Hospitality, LLC ("Vraiment"), is a limited liability company based in Charlotte, North Carolina, that was created in 2008 by Lynn St. Laurent and Bill Lamb (Doc. 33). The defendants are individuals Todd and Carole Binkowski, and Small Company Advisor, LLC, which is a Delaware company located in Tampa, Florida.

The plaintiff owns and operates two restaurants in Charlotte, North Carolina, named "Amelie's ... a French Bakery and Café" ("Amelie's") (id., ¶¶11, 12). Amelie's avers that it prepares high quality foods, such as French confections and pastries, that are served in an inviting atmosphere which encourages patrons to stay as long as they wish (Doc. 5, ¶¶9, 11). Amelie's interior décor, which was designed by decorator and Vraiment member Brenda Ische, is "an eclectic amalgamation of Francophile pieces, antique and replica furniture, and customized artwork" (Doc. 2, p. 4; Doc. 3, ¶¶2, 3). The style of the interior décor has been referred to as "Paris shabby chic" (Doc. 5, Ex. C-2; see also Doc. 24-1, ¶2(c)). Amelie's has received accolades for its desserts and its interior

décor, and its business has grown rapidly since 2008, as reflected by its gross income of 2.3 million dollars in 2010 (Doc. 2, pp. 3, 4 n.2; Doc. 5, ¶¶15-17).

In 2009 or 2010, defendants Todd and Carole Binkowski, who were friends of Vraiment principal Bill Lamb, inquired about opening an Amelie's restaurant in Tampa, Florida (Doc. 4, ¶11). Although the parties did not have a signed agreement, the parties' initial communications contemplated a replication of Amelie's in Tampa, to be jointly owned by the Binkowskis and Vraiment (see id., ¶¶16, 17).

In the summer and fall of 2010, the plaintiff assisted in preparing the Tampa Amelie's for opening by providing, among other things, recipes and training (see Doc. 5, ¶¶26, 27). Further, Ische created in the Tampa Amelie's an interior décor that resembled the Charlotte Amelie's interior (Doc. 3, ¶¶7, 8). The parties also promoted the Tampa Amelie's opening, with the Binkowskis creating the website, www.ameliesbakery.com, and a Facebook page for "Amelie's Hyde Park" (Doc. 2, p. 7).

Shortly after the Tampa Amelie's opened in February 2011, disagreements arose between the parties, with the defendants ultimately asserting that they only wanted to purchase the plaintiff's "know how" (see

Doc. 1, Ex. D).  On March 23, 2011, the parties executed a "Summary Term Sheet" which provided that, instead of joint ownership of the Tampa Amelie's, the defendants would pay the plaintiff for use of its recipes and the right to use the Amelie's name (id., Ex. F).  However, after the parties could not agree upon a formal licensing agreement, the plaintiff notified the defendants on April 20, 2011, that they were no longer authorized to use the Amelie's name, recipes, décor, or other intellectual property (Doc. 4, ¶40, Ex. A-12).

About April 29, 2011, the defendants changed the name of the Tampa Amelie's to "Sophie's French Bakery and Café" (Sophie's) (Doc. 2, p. 10).  The plaintiff, however, alleged that the defendants continued to use its recipes and retained the Amelie's décor so that the defendants were essentially operating a copy of the plaintiff's establishment with a different name (id.).  Further, the plaintiff asserted that the defendants continued to use the Amelie's name on the internet to promote Sophie's restaurant (see Doc. 6).[1]

---

[1] For example, the defendants embedded meta tags within the source codes of Sophie's website which contain "Amelie's" and "salted caramel brownie," so that Sophie's website appeared in the list of search results when internet users inserted those terms into a search engine such as Google.

Consequently, the plaintiff filed a lawsuit against the defendants, alleging trade dress infringement and unfair competition in violation of the Lanham Act, 15 U.S.C. 1125(a), and Florida common law; misappropriation of trade secrets in violation of Florida's Uniform Trade Secrets Act, Chapter 688; conversion; and unjust enrichment (Doc. 1). Additionally, the plaintiff filed a Motion for Preliminary Injunction which sought to prohibit the defendants from using the "Amelie's" name or recipes, and to order the defendants to remove all items of Amelie's trade dress from their restaurant and show that they have an independent source for their recipes (Doc. 2, pp. 3, 10-11).

The motion for preliminary injunction was referred to me for a report and recommendation (Doc. 9). The defendants filed an opposition memorandum, arguing that the motion is not meritorious because the plaintiff's décor is not protectable trade dress, and that they were no longer using the plaintiff's recipes or the Amelie's name (Doc. 19, pp. 1-2).

At the time scheduled for the hearing on the Motion for the Preliminary Injunction, the parties negotiated, and entered into, a Settlement

Agreement (see Docs. 21, 24-1).[2]  Thus, the parties advised the court that

they had resolved the case and did not object to its dismissal (see Doc. 21).

Accordingly, the case was dismissed without prejudice on July 8, 2011,

subject to the right of the parties to re-open the action within 60 days for

good cause shown (Doc. 22).

On September 6, 2011, the plaintiff filed a Motion to Enforce

the Settlement Agreement, arguing that the defendants breached the

agreement (Doc. 24).   The defendants denied that they materially breached

the agreement (Doc. 25).   The district court denied the plaintiff's Motion to

Enforce the Settlement Agreement, stating that "[t]his court … is without

jurisdiction to enforce the settlement agreement because it did not retain

jurisdiction over the settlement agreement nor incorporate the terms of the

settlement agreement in the order" dismissing the case (Doc. 26, p. 2).

However, in the alternative, the district court re-opened the case and ordered

the "continuation of the hearing on the motion for preliminary injunction"

(id., p. 3).

---

[2]The Settlement Agreement provided that the defendants would remove certain décor items from Sophie's, repaint the interior walls so that they were not alternating stripes of blue, show independent sources for their recipes, re-name their salted caramel brownie, remove all references to Amelie's and the salted caramel brownie, and assign their rights in www.ameliesbakery.com to the plaintiff (Doc. 24-1).

The parties sought, and were granted, two continuations of the hearing on the Motion for Preliminary Injunction (Docs. 31, 32, 34, 35). In the interim, the plaintiff filed an amended complaint, which added claims for breach of contract and breach of the implied covenant of good faith and fair dealing, based on the defendants' alleged failure to perform the Settlement Agreement (Doc. 33). The defendants filed an answer and asserted several counterclaims, including breach of contract based on the Settlement Agreement (Doc. 41).

It became apparent at the continued hearing on the Motion for Preliminary Injunction that much of the evidence submitted in support of the motion had become stale because the defendants had remedied many of the plaintiff's allegations of infringement in the interim (see Doc. 39). Furthermore, the plaintiff argued at the hearing a new legal ground for entry of an injunction. Thus, the plaintiff contended that the court should enter a permanent injunction that enforces the terms of the Settlement Agreement. I was dubious of this request in light of the court's denial of the Motion to Enforce the Settlement Agreement. Consequently, the parties were given 20 days to supplement their Motions for Preliminary Injunction with

pertinent legal argument and current facts regarding the dispute (Docs. 39, 40).

In response, both parties submitted supplemental memoranda and affidavits (Docs. 45, 46, 47, 48, 50, 51, 52, 53, 54, 55, S-1, S-2). In its supplement, the plaintiff seeks the entry of a "final permanent injunction" consistent with the terms of the Settlement Agreement (Doc. 51, p. 5). Alternatively, it requests preliminary injunctive relief which prohibits the defendants from "(1) using the 'Amelie's' name in any way; (2) decorating and arranging their restaurant ('Sophie's') in such a way that copies 'Amelie's' style; and (3) selling a salted caramel brownie or other products made from confidential trade secret recipes owned by Vraiment" (id., pp. 1-2).[3]

The defendants argue in their supplemental opposition memorandum that the motion should be denied because the infringing conduct has ceased (Doc. 55, p. 3). Thus, the defendants aver that they: (1) ceased using the "Amelie's" name; (2) transferred the domain name "ameliesbakery" to the plaintiff; (3) no longer reference Amelie's or salted

---

[3]The plaintiff states that it attached to the supplemental brief a proposed injunction (Doc. 51, p. 5), but there is no attachment to the brief in the court docket.

caramel brownie in the source codes or metadata for Sophie's website; (4) do not use Amelie's recipes, and have provided the plaintiff with the independent sources for Sophie's recipes; and (5) painted one-half of the restaurant in a green paint color in accordance with the plaintiff's request that the interior walls not be painted with blue stripes (Doc. 25, ¶20; Doc. 50, ¶4; Doc. 54, ¶¶14-20, 22). Further, the defendants returned to the plaintiff the following décor items that the plaintiff characterized in the Settlement Agreement as its trade dress (Doc. 54, ¶12):

> Two Matisse style mosaic tables, chandeliers, wall art paintings of "the Blue Boy," inflatable picture frame art, and framed "Etch a Sketch" art, maps of the city of Paris, France, painted items arranged to form the word "Love" or the word "Amor," partially completed Mona Lisa "paint by numbers," stacked lamps, three piece wood dividing screen with bookshelf trample l'oeil painting, table tops with decopauge place settings, a "starburst mirror" and "corner mirror," cherub lamp and bust, two checkerboard chargers.

## II.

As a preliminary matter, it is appropriate to address the plaintiff's request for "a final permanent injunction" that is "consistent with the terms of the Settlement Agreement" (Doc. 51, p. 5). This request was raised for the first time in the continued hearing on the Motion for

Preliminary Injunction, and discussed further in the plaintiff's Supplemental Brief in Support of Motion for Preliminary Injunction (Doc. 51). The plaintiff, however, has not stated a meritorious basis for such relief.

The plaintiff requests a permanent injunction "in order to give the Settlement Agreement full force and effect" (id., p. 4).[4] However, Judge Covington has already denied the plaintiff's Motion to Enforce the Settlement in accordance with the United States Supreme Court's decision in Kokkonen v. Guardian Life Ins. Co. of America, 511 U.S. 375 (1994), which held that a court lacks jurisdiction to enforce a settlement agreement after the case has been dismissed if the court did not retain jurisdiction over the settlement agreement (Doc. 26, p. 2).[5] The court did not retain jurisdiction over the parties' settlement agreement when it dismissed this case. Therefore, the plaintiff's request for an injunction to give "full force and effect" to the Settlement Agreement would circumvent the district court's

---

[4]It is also noted that the matter referred for my consideration was the plaintiff's motion for a preliminary injunction (Doc. 26, p. 3), not a final permanent injunction.

[5]The plaintiff states that the court denied the "[M]otion to [E]nforce ... as premature and the Motion was referred back to Judge Wilson for further hearing" (Doc. 51, p. 2 n.1). This statement is misleading. Thus, the district court did not state that the Motion to Enforce the Settlement Agreement was premature, and the matter "referred back" for my consideration was the Motion for Preliminary Injunction (Doc. 26, p. 3).

order denying the Motion to Enforce the Settlement Agreement, as well as the holding in Kokkonen.

The plaintiff argued at the hearing that the court has jurisdiction to enforce the settlement agreement because it reopened the case. In this regard, the plaintiff cites Ford v. Citizens and Southern Nat. Bank, 928 F.2d 1118, 1121 (11th Cir. 1991), which states the general rule that a court may enforce settlement agreements in a pending case (Doc. 51, p. 3). However, Ford is procedurally inapposite because the plaintiff filed the Motion to Enforce the Settlement Agreement in a closed case.

Furthermore, there is legal authority holding that the reopening of a case does not confer jurisdiction to enforce a settlement agreement. Shaffer v. GTE North, Inc., 284 F.3d 500 (3rd Cir. 2002). Thus, the "reinstatement of an action ... revives the underlying claim and sends the litigants back to the original battlefield." Id. at 503. That "is totally different from the enforcement of the terms of a settlement agreement," which is "more than just a continuation or renewal of the dismissed suit." Id. at 503, 504; see also McAlpin v. Lexington 76 Auto Truck Stop, Inc., 229 F.3d 491, 503 (6th Cir. 2000), cert. denied, 532 U.S. 905 (2001)(enforcement

of a settlement agreement by reopening the case would "swallow the rule" in Kokkonen).

Finally, it is noted that the plaintiff failed to provide the court with its proposed final injunction, so the specific terms of that request cannot be assessed. Nonetheless, a proposed injunction that tracks the language of the Settlement Agreement would not, as the plaintiff argued at the hearing, resolve this matter because the parties dispute the interpretation of at least two essential terms (see Doc. 25).

For these reasons, it is inappropriate to consider at this juncture the plaintiff's request for a permanent injunction that "is consistent with the terms of the Settlement Agreement" (Doc. 51, p. 2). Accordingly, the plaintiff's Motion for a Preliminary Injunction will be considered on its original grounds that the defendants are infringing its trade dress, engaging in unfair competition, and misappropriating the plaintiff's trade secrets (Docs. 2, 51).

Significantly, however, the specific requests in the original motion have been rendered moot, to a great extent, by remedial action by the defendants. Thus, the plaintiff sought an order "that Defendants (a) abandon all item [sic] of Vraiment's unique trade dress – easily ascertained

as those obtained from, through, or with the assistance of Brenda Ische, (b) demonstrate that they have a source of each of Defendants' recipes that is independent of Vraiment (and stop using any recipes, methods and processes they received from Vraiment), and (c) stop all use of Vraiment's tradename 'Amelie's'" (Doc. 2, p. 25).

The defendants have returned much of the trade dress items that they received through Ische, and what has not been returned appears to be functional and thus not protectable. The defendants had submitted a different recipe for a salted caramel brownie, which is the recipe that appears to be in dispute. Also, the defendants seem to have ceased any use of the name "Amelie's."

Consequently, the plaintiff has achieved much of what it sought in the motion for a preliminary injunction. Nevertheless, the plaintiff continues to seek preliminary injunctive relief. For the following reasons, that request is unpersuasive.

III.

A preliminary injunction may be issued when necessary "to protect the plaintiff from irreparable injury and to preserve the district court's power to render a meaningful decision after a trial on the merits." <u>Canal</u>

-13-

Authority of State of Fla. v. Callaway, 489 F.2d 567, 572 (5ᵗʰ Cir. 1974).

The plaintiff is not entitled to a preliminary injunction unless it establishes

each of the following four prerequisites: (1) a substantial likelihood of

success on the merits; (2) a substantial threat of irreparable injury; (3) that

the threatened injury to the plaintiff outweighs the potential harm to the

defendants; and (4) that the injunction will not disserve the public interest.

Palmer v. Braun, 287 F.3d 1325, 1329 (11ᵗʰ Cir. 2002). In the Eleventh

Circuit, a preliminary injunction is "an extraordinary and drastic remedy not

to be granted unless the movant clearly establishe[s] the burden of

persuasion as to the four requisites." McDonald's Corp. v. Robertson, 147

F.3d 1301, 1306 (11ᵗʰ Cir. 1998). Consequently, the motion should

ordinarily be denied if the movant fails to meet its burden as to even one of

the foregoing prerequisites. United States v. Jefferson County, 720 F.2d

1511, 1519 (11ᵗʰ Cir. 1983). These traditional four factors apply as well to

infringement cases. See Hi-Tech Pharmaceuticals, Inc. v. Herbal Health

Products, Inc., 132 Fed. Appx. 348, 350 (11ᵗʰ Cir. 2005).

IV.

A. The plaintiff's attempt to show a substantial likelihood of

success on the merits as to the claim of trade dress infringement under the

Lanham Act is deficient in two respects. Thus, the plaintiff has not demonstrated that the portions of its trade dress that the defendants have not changed are protectable under the Lanham Act because they are inherently distinctive and non-functional. In addition, the plaintiff has not established a likelihood of confusion between the two trade dresses.

"Trade dress" is the total image and overall appearance of a product. Blue Bell Bio-Medical v. Cin-Bad, Inc., 864 F.2d 1253, 1256 (5th Cir. 1989). The trade dress of a restaurant, such as identifying signs and décor, may be protected under §43(a) of the Lanham Act. Two Pesos, Inc. v. Taco Cabana, Inc., 505 U.S. 763, 765 n.1 (1992).

Trade dress infringement is established by showing that (1) the plaintiff's trade dress is inherently distinctive, or — something that the plaintiff has not contended — it has acquired secondary meaning; (2) it is primarily non-functional; and (3) the defendant's trade dress is the same, or confusingly similar to the plaintiff's, such that consumers are likely to confuse the two. Id. at 769; Planetary Motion, Inc. v. Techsplosion, Inc., 261 F.3d 1188, 1193 (11th Cir. 2001).[6]

---

[6]The plaintiff initially argues that this dispute is akin to a franchise agreement, and that the defendants' continued use of its trade dress therefore constitutes infringement (see Doc. 2, p. 11). However, the plaintiff has yet to establish a protectable trade dress,

The plaintiff argues that Amelie's "unique and eclectic design" makes its décor inherently distinctive (Doc. 2, p. 14).[7] The parties agree that, when determining whether a trade dress is inherently distinctive, it is appropriate to consider "whether it is a common, basic ... design, whether it is unique or unusual in a particular field, and whether it is a mere refinement of a commonly-adopted and well-known form of ornamentation for a particular class of goods" (Doc. 2, p. 14; Doc, 19, p. 5, quoting AmBrit, Inc. v. Kraft, Inc., 812 F.2d 1531, 1536 (11th Cir. 1986), cert. denied, 481 U.S. 1041 (1986)). The plaintiff asserts that, "[f]rom the custom built chandeliers and decoupage place settings, to the mixture of kitsch and traditional artwork, Amelie's [décor] is uncommon" and "more than a simple refinement of commonly adapted themes" (Doc. 2, p. 14).

Accepting, arguendo, that the trade dress of the Amelie's restaurants in Charlotte is inherently distinctive and non-functional, the defendants have substantially modified their Sophie's restaurant in Tampa.

and the likelihood of confusion cannot be presumed because the plaintiff is not a well-known franchise. Therefore, a franchisor-franchisee analysis is inapposite with respect to the request for preliminary injunctive relief.

[7] Thus, the plaintiff is not contending that the trade dress has secondary meaning, which would require the plaintiff to show that, "in the minds of the public, the primary significance of .... [the trade dress] is to identify the source of the product rather than the product itself." Two Pesos, Inc. v. Taco Cabana, Inc., supra, 505 U.S. at 766 n.4.

Accordingly, the plaintiff requests in its supplemental memorandum injunctive relief that is broader than a prohibition against replicating Amelie's interior. Thus, the plaintiff seeks to prohibit the defendants from "decorating and arranging their restaurant...in such a way that copies 'Amelie's' style" (Doc. 51, p. 1). However, the plaintiff makes no attempt to show that the aspects of its trade dress that the defendants have not changed are inherently distinctive.

Furthermore, a request for an injunction prohibiting the defendants from decorating in a way that copies "Amelie's style" is impermissibly vague. Thus, pursuant to Rule 65(d)(1)(C), F.R.Civ.P., "[e]very order granting an injunction must ... describe in reasonable detail ... the act or acts restrained or required." Accordingly, a prohibition against trade dress that is "confusingly similar" does not satisfy Rule 65 because it fails to "adequately specif[y] the acts which [the defendant] must discontinue in order to avoid" infringement. John H. Harland Co. v. Clarke Checks, Inc., 711 F.2d 966, 984, 985 (11th Cir. 1983); see also 1 McCarthy on Trademarks and Unfair Competition, at §8:3 (4th ed. 1998)(an imprecise injunction leaves the defendant uncertain as to how to avoid a charge of contempt and also creates dangers of anti-competitive overprotection).

Furthermore, an injunction prohibiting a party from decorating "in a way that copies 'Amelie's' style" is too vague to analyze under the Lanham Act, and inhibits lawful competition. Thus, a general prohibition against decorating "in a way that copies 'Amelie's' style" is impermissible because the plaintiff "does not have a business interest capable of protection in the mere method and style of doing business." Prufrock Ltd., Inc. v. Lasater, 781 F.2d 129, 131-32 (8th Cir. 1986).[8] As the Prufrock decision explained, "[i]t would be ludicrous to suggest ... one producer and not another is permitted to take advantage of a marketing approach to enhance customer reception of its product." Id. at 132. Additionally, "Amelie's style," which has been fairly characterized as "Paris shabby chic," is not exclusive to Amelie's because other restaurants also decorate in a shabby chic style (see, e.g., Doc. 54-4, pp. 2, 4).

This does not mean that the plaintiff cannot protect a specific combination of elements which, taken together, creates a distinctive visual impression. See Landscape Forms v. Columbia Cascade Co., 113 F.3d 373,

---

[8]In Prufrock, the court rejected the plaintiff's claim that its restaurant, which offered down home country cooking, could protect under the Lanham Act its trade dress which included "various antique and country appointments and décor," and church pew booths for seating. Id. at 130.

381 (2nd Cir. 1997). However, the closest the plaintiff comes to a specific expression of that appearance in its supplemental memorandum is the assertion that "alternating light blue and dark blue vertical stripes on the interior walls, together with mis-matched furniture, custom chandeliers, eclectic wall art, the Amelie's name and logo, and other features ... constitute a unique and protectable trade dress" (Doc. 51, p. 10). This trade dress description is inadequate, as the plaintiff cannot monopolize the use of mismatched furniture in a restaurant, and the plaintiff fails to identify the "other features" and "eclectic wall art" that constitute its trade dress. And, as indicated, the defendants no longer use the Amelie's name and logo.

The plaintiff provided a specific list of trade dress items with its original motion (Doc. 2, p. 7 n.6). However, the majority of those décor items have not only been removed, but were returned to the plaintiff (Doc. 54, ¶12). Further, the defendants aver that they have not replaced that décor with the same items (id., ¶13). Therefore, the defendants' alleged infringing conduct with regard to those décor elements has ceased, and is unlikely to reoccur. "[F]ederal courts should not grant injunctive relief when the conduct sought to be stopped has ceased and is unlikely to resume." Snair v. City of Clearwater, 787 F.Supp. 1401, 1415 (M.D. Fla. 1992); see

also Burger King Corp. v. Weaver, 33 F.Supp.2d 1037, 1039-40 (S.D. Fla. 1998).

The remaining elements of the plaintiff's listed trade dress are couches, furniture, drapes, and chalk board menus (see Doc. 2, p. 7 n.6). These general items, however, are not protectable because they are functional. See Two Pesos, Inc. v. Taco Cabana, Inc., supra, 505 U.S. at 769. For example, couches and tables, even with an artistic flare, are functional, as they provide a place to consume food and beverages. See Dippin' Dots, Inc. v. Frosty Bites Distribution, LLC, 369 F.3d 1197, 1203 (11th Cir. 2004), cert. denied, 543 U.S. 1054 (2005)(an aesthetic feature is functional if it would "put competitors at a significant non-reputation-related disadvantage"); Prufrock Ltd., Inc. v. Lasater, supra, 781 F.2d at 133 ("A restaurant should not be able to monopolize functional components which improve the usefulness, efficiency, or appeal of the product or service."). Further, the plaintiff acknowledges the functionality of this décor, as it asserts that its business model encourages patrons to stay as long as they wish (Doc. 5, ¶9). Therefore, the plaintiff cannot preclude others from using these functional elements.

The plaintiff also seeks to protect the blue-on-blue stripes of its interior walls. However, interior striped walls, whether in blue or another color, are not unique, and the plaintiff "concedes that blue stripes alone may not constitute 'trade dress'" (Doc. 51, p. 10). See Qualitex Co. v. Jacobson Products Co., Inc., 514 U.S. 159, 163 (color is not inherently distinctive).

In sum, the plaintiff has failed to meet its burden of identifying a protectable trade dress for which preliminary injunction relief is warranted.

In addition, the plaintiff has failed to show a substantial likelihood of prevailing on the merits because it has not demonstrated that consumers are likely to be confused by the defendants' adoption of a trade dress that is purportedly similar to the plaintiff's. Dippin' Dots, Inc. v. Frosty Bites Distribution, LLC, supra, 369 F.3d at 1207. Thus, the plaintiff must show there is a likelihood that consumers will assume an affiliation between Amelie's and Sophie's. The main problem with this argument is that, due to the distance between the establishments, the customers are unlikely to know of both restaurants and therefore would be unaware of any similarity in trade dress that could cause confusion.

The following factors are considered in determining whether a likelihood of confusion exists: the strength of the trade dress, the similarity

of the trade dress, the similarity of the products sold, the similarity of retail outlets and purchasers, the similarity of advertising media used, the defendants' intent, and actual confusion. AmBrit, Inc. v. Kraft, Inc., supra, 812 F.2d at 1538. Although all of the factors must be considered, the appropriate weight to be given to each of these factors varies with the circumstances of the case. Id. Thus, in appropriate circumstances, even one factor can be dispositive. See, e.g., Dippin' Dots, Inc. v. Frosty Bites Distribution, LLC, supra, 369 F.3d at 1208 n. 12 (although six of the factors weighed in favor of the plaintiff, one factor overwhelmingly favored the defendant so that there was no likelihood of confusion).

The first factor to consider is whether the plaintiff's trade dress makes a strongly distinctive visual impression. John H. Harland Co. v. Clarke Checks, Inc., supra, 711 F.2d at 973. Although not easily applied in the restaurant context, the classification of marks, in categories of increasing distinctiveness, has been used to assess trade dress strength. See AmBrit, Inc. v. Kraft, Inc., supra, 812 F.2d at 1537. The categories are: (1) generic; (2) descriptive; (3) suggestive; and (4) arbitrary. Id. An arbitrary trade dress has no inherent relationship to the product or service with which it is associated. Id., n.20. A suggestive trade dress suggests some

characteristic of the product or service to which it is applied, but requires the consumer to use his imagination to determine the nature of the product or service. Id. A descriptive trade dress describes a characteristic or quality of the product or service, such as its intended use, its ingredients, its dimensions, its desirable features, or its end effect on the consumer. Id. A generic mark merely refers to a particular class of which an individual product or service is a member. Id. These classifications are no longer viewed as distinct categories but as part of a spectrum that tend to merge at the edges and are frequently difficult to apply. Soweco, Inc. v. Shell Oil Co., 617 F.2d 1178, 1183 (5th Cir. 1980), cert. denied, 450 U.S. 981 (1981).

A purely arbitrary or fanciful trade dress is generally considered strong and is given a wide range of protection. John H. Harland Co. v. Clarke Checks, Inc., supra, 711 F.2d at 974. A descriptive trade dress, on the other hand, is considered weak and is given a "narrow range of protection." Id. A suggestive trade dress falls somewhere between these two types and, although a suggestive trade dress can be protected without evidence that it has acquired secondary meaning, it is comparatively weak. Id. A generic mark never receives protection. AmBrit, Inc. v. Kraft, Inc., supra, 812 F.2d at 1537 n.20.

The plaintiff argues that its décor is "arbitrary, based on the uniqueness of its shape and design, and the lack of similar trade dress found in other cafes and restaurants" (Doc. 2, p. 15). This contention is unpersuasive because the plaintiff's Paris shabby chic décor, with its "eclectic amalgamation of Francophile pieces" (id., p. 4), bears a direct relationship to its "French bakery and café." Therefore, the plaintiff's trade dress could be considered descriptive or, at most, suggestive. Further, the fact that other restaurants and cafes incorporate the shabby chic décor in their restaurants weakens the distinctiveness of the trade dress. See John H. Harland Co. v. Clarke Checks, Inc., supra, 711 F.2d at 975 (consider third party usage in evaluating strength). Therefore, this factor does not greatly favor the plaintiff.

The similarity of design, which is "really nothing more than a subjective eyeball test," considers the overall impression created by the trade dress. AmBrit, Inc. v. Kraft, Inc., supra, 812 F.2d at 1540. Viewing the trade dress as a whole, the overall impression conveyed by Amelie's and Sophie's restaurants is similar, although the similarities are diminished by Sophie's modifications. Further, the parties sell the same types of products (French food and pastries, confections and beverages) in the same type of

retail establishment (a mixed bakery/café). Therefore, these two factors favor the plaintiff.

The similarity of retail outlets and purchasers is the key factor in this case because the distance between these establishments — Tampa, Florida, to Charlotte, North Carolina — is hundreds of miles, and results in each restaurant having a distinct clientele which substantially undermines the likelihood of customer confusion. Thus, "[d]issimilarities between the retail outlets for and the predominant customers of plaintiff's and defendant's goods lessen the possibility of confusion, mistake, or deception." John H. Harland Co. v. Clarke Checks, Inc., supra, 711 F.2d at 976. In particular, this factor has been found important when restaurants operate in separate markets. See T.G.I. Friday's, Inc. v. Int'l Restaurant Group, Inc., 405 F. Supp. 698, 707 (M.D. La. 1975), aff'd, 569 F.2d 895, 899 (5th Cir. 1978); Buca, Inc. v. Gambucci's, Inc., 18 F.Supp.2d 1193, 1210 (D. Kan. 1998) ("Because the two [restaurants] operate in separate markets ... the likelihood of confusion is slight.").

The plaintiff in T.G.I. Friday's was a franchisor, with a location in Jackson, Mississippi (among other places). It alleged the defendant committed trademark and trade dress infringement when it opened a

restaurant in Baton Rouge, Louisiana, named "Ever Lovin' Saturdays" which used a trade dress that mirrored the plaintiff's "turn of the century" theme. 405 F. Supp. at 705.

The court in T.G.I. Friday's rejected the claim, holding that, because the patrons of the defendant's restaurant were unlikely to be familiar with the plaintiff's restaurant which was located in a different city, they would not be aware of the similarities in trade dress that could cause customer confusion. See id. at 707. In affirming, the former Fifth Circuit agreed that "the physical similarities between the restaurants were irrelevant to the issue of infringement since the [plaintiff's restaurant] had no reputation in the [defendant's] area." 569 F.2d at 899.

In this case, neither party has a well-known brand, and because hundreds of miles separate Amelie's and Sophie's, it is unlikely that an appreciable number of Sophie's customers know of Amelie's (or that North Carolina residents are familiar with Sophie's).[9]  See John H. Harland Co. v. Clarke Checks, Inc., supra, 711 F.2d at 979 n.22 (there must be a likelihood of confusion in the minds of an appreciable number of reasonably prudent buyers).  Consequently, the plaintiff has not shown that the similarity in

---

[9]Although Amelie's was in Tampa for two months, the plaintiff has not shown that this presence resulted in significant brand recognition.

trade dress is likely to cause confusion or lead customers to assume an affiliation between Sophie's and Amelie's.

The plaintiff argues that it has been patronized by numerous customers who reside outside of North Carolina, and that its "widespread reputation and acclaim with customers and Facebook 'fans' spread throughout most of the United States ... broadens the scope of its market beyond merely Charlotte, North Carolina" (Doc. 2, p. 12). However, this contention does not show that an appreciable number of Sophie's patrons are familiar with Amelie's. To the contrary, on the Facebook details page, Tampa is not identified as a city which has a significant number of Facebook members accessing Amelie's page (see Doc. 5, pp. 8-9, Ex. C-1).

With respect to the similarity of advertising media, the parties commonly use the internet and social media sites, such as Facebook, to advertise their businesses. However, the parties' internet marketing is completely separate and distinct; the establishments have different names and are located in different states. Further, there are no longer any references to Amelie's in the metadata or source codes for Sophie's website. Therefore, there is no reason to think that their common use of these media outlets is likely to cause confusion.

As to the factor of intent, when the parties commenced their joint venture, the parties intended the Tampa restaurant to look like Amelie's restaurant and serve Amelie's menu items (Doc.4, Ex. A-1). Further, there is evidence that the defendants continued to use Amelie's trade dress and intellectual property after the plaintiff withdrew its permission to do so (see, e.g., Doc. 6). Therefore, this factor weighs in the plaintiff's favor, at least until the defendants significantly modified Sophie's appearance. At that point, the factor of intent provides, at most, just little support for the plaintiff's claim of likelihood of confusion.

"[E]vidence of actual confusion between trademarks is not necessary to a finding of likelihood of confusion, although it is the best such evidence." E. Remy Martin & Co., S.A. v. Shaw-Ross Intern. Imports, Inc., 756 F.2d 1525, 1529 (11th Cir. 1985). In this regard, the plaintiff has presented evidence from two former North Carolina residents who patronized Amelie's and Sophie's (Doc. 46, ¶¶4; Doc. 47, ¶¶2, 4).

Jamie Rae Wheeler, a resident of Ponte Vedra Beach, visited Sophie's on May 15, 2011, because she had heard that Amelie's was opening a restaurant in Tampa, and a Google search had identified the Hyde Park restaurant (Doc. 46, ¶¶2, 11). Wheeler stated that she thought she was

eating at an Amelie's restaurant until an employee told her it was Sophie's (id., ¶¶14-16). Peter J. Lee, a resident of New Port Richey, visited the restaurant on March 28, 2011, when it was still Amelie's, and stated that the Tampa Amelie's possessed the principal attributes of the Charlotte Amelie's (Doc. 47, ¶¶2, 11, 12). Lee visited the restaurant again in October 2011, after it became Sophie's, and noted that much of the artwork was gone and the restaurant had a different "vibe" (id., ¶¶17, 18, 21, 22).

These isolated incidents do not show that there is a substantial likelihood of confusion. First, neither of these patrons resides in Tampa, much less in the Hyde Park area (Docs. 46, 47; ¶¶2, 4, 5). Thus, it is unclear whether they are typical of the people who patronize Sophie's. See John H. Harland Co. v. Clarke Checks, Inc., supra, 711 F.2d at 979 n.22. Furthermore, the appearance of Sophie's has changed since Wheeler and Lee initially visited; in fact, Lee's comments that the restaurant had a "different vibe" in October 2011 shows that the changes to Sophie's are appreciable. Moreover, neither patron departed Sophie's confused that it was affiliated with Amelie's (Doc. 46, ¶¶14-16; Doc. 47, ¶17). Therefore, these two affidavits are not persuasive evidence that customer confusion is likely among an appreciable number of customers.

Overall, the factors bearing on likelihood of confusion do not support the plaintiff's contention on that issue following Sophie's modification, which, of course, is the relevant appearance and period with respect to the motion for preliminary injunction. Only the similarity of products strongly favors the plaintiff, while most of the other factors favor the plaintiff just minimally, if at all. On the other hand, here, as in T.G.I. Friday's, Inc. v. Int'l Restaurant Group, Inc., supra, 405 F.Supp. at 707, and Buca, Inc. v. Gambucci's, Inc., supra, 18 F.Supp.2d at 1210, the distance between the businesses and the dissimilarity of customers cuts very strongly against a claim of likelihood of confusion. Considering all the factors together, the plaintiff has not made an adequate showing of likelihood of confusion.

In sum, the plaintiff has not demonstrated that the portions of its trade dress that the defendants still employ are inherently distinctive and non-functional. Moreover, the plaintiff has not shown that the restaurants' current trade dresses are likely to cause confusion. Consequently, the plaintiff has not sufficiently shown a likelihood of success on its claim of trade dress infringement under the Lanham Act.

B. The plaintiff also seeks to obtain preliminary injunction relief on claims of unfair competition and false advertising.

The plaintiff bases those claims on the defendants' use of the internet to allegedly suggest a false affiliation between Sophie's and Amelie's. In this regard, the plaintiff argues that the defendants (1) included the words "Amelie's" and "salted caramel brownie" in the source codes and metadata for the Sophie's website, and (2) maintained the website domain name www.ameliesbakery.com, and a Facebook page for "Amelie's Hyde Park Village," which directed visitors to the Sophie's website (Doc. 2, pp. 18, 21; Doc. 51, pp. 7-8).[10]

The elements of an unfair competition claim are similar to the elements of a trademark infringement claim under Section 43(a) of the Lanham Act. See Tally-Ho, Inc. v. Coast Community College Dist., 889 F.2d 1018, 1026 (11th Cir. 1989); Investacorp, Inc. v. Arabian Inv. Banking Corp., 931 F.2d 1519, 1521 (11th Cir. 1991), cert. denied, 502 U.S. 1005 (1991). To establish a likelihood of success on the merits of a false

---

[10]"Meta tags consist of words or phrases embedded within the website's computer code that are intended to describe the contents of a website.... Although websites do not display their meta tags to visitors, internet search engines may rank a webpage that contains the search terms within its meta tags higher in a list of internet search results." North American Medical Corp. v. Axiom Worldwide, Inc., 522 F.3d 1211, 1217 n.2 (11th Cir. 2008).

advertising claim, the plaintiff must show: "(1) the ads of the opposing party were false or misleading, (2) the ads deceived, or had the capacity to deceive, consumers, (3) the deception had a material effect on purchasing decisions, (4) the misrepresented product or service affects interstate commerce, and (5) the movant has been — or is likely to be — injured as a result of the false advertising." North American Medical Corp. v. Axiom Worldwide, Inc., supra, 522 F.3d at 1224.

The plaintiff argues it is likely to prevail on these claims because "Amelie's" is a valid trademark, and the defendants have, without authorization, used "Amelie's" and "salted caramel brownie" in order to attract customers to the Sophie's website. The plaintiff argues that this suggested false affiliation usurps the plaintiff's goodwill and is likely to cause confusion as to the plaintiff's affiliation or sponsorship of Sophie's (Doc. 2, p. 21).

The defendants respond that a preliminary injunction is unnecessary because they no longer use the Amelie's name in any form. Thus, they state that they have removed the Amelie's name from the metadata and source codes embedded in their website, discontinued their

Facebook page with the Amelie's name, and assigned the website domain name "ameliesbakery" to the plaintiff (see Doc. 54; Doc. 55, p. 8).

As indicated, when conduct sought to be enjoined has ceased and is unlikely to resume, federal courts generally should not grant injunctive relief. Burger King Corp. v. Weaver, supra, 33 F.Supp.2d at 1039-40. The plaintiff, relying on the Burger King case, argues that injunctive relief should be entered to prevent the defendants from future infringement of the Amelie's name. However, Burger King is inapposite because, among other things, the Burger King defendant was found likely to infringe in the future. Id. at 1040. In this case, the defendants have renamed their restaurant "Sophie's," and established their own customer base which recognizes and associates them with the Sophie's name (Doc. 55, p. 8). Therefore, in this circumstance, the plaintiff's conclusory allegation that the defendants are likely to infringe the Amelie's mark in the future is insufficient. Consequently, I recommend that the request for a preliminary injunction which precludes the defendants from using the Amelie's name be denied.

C. Finally, the plaintiff seeks an injunction precluding the defendants from using Amelie's salted caramel brownie recipe, which it

alleges is a violation of Florida's Uniform Trade Secrets Act (Doc. 51, pp. 5-7).[11]  Because the plaintiff has presently failed to show that it is substantially likely to prevail on this claim, I recommend that this relief be denied.

In order to prove misappropriation of a trade secret under Florida law, a plaintiff must prove: (1) the existence of a trade secret and (2) that the secret was misappropriated.   See Border Collie Rescue, Inc. v. Ryan, 418 F.Supp.2d 1330, 1338 (M.D. Fla. 2006).   The Act defines a "trade secret" (§688.002(4), Fla. Stat.) as:

> information ... that ... [d]erives independent economic value ... from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use; and [i]s the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

The plaintiff argues that its salted caramel brownie is a trade secret because it is comprised of a unique combination of ingredients, and

---

[11]In the original Motion for Preliminary Injunction, the plaintiff also specified that Amelie's tea cakes, cream cheese muffins, petit gateaux, and tartines are trade secrets (Doc. 2, pp. 21-22).   However, these products are not mentioned in the plaintiff's supplemental memorandum, and the plaintiff does not present evidence showing that they are trade secrets. Therefore, it is assumed that any claim with regard to these recipes is abandoned for the purposes of the preliminary injunction.

that it has taken reasonable steps to protect the secrecy of the recipe (Doc. 51, p. 5). In this regard, the plaintiff presents the affidavit of Amanda E. Schade, a culinary school graduate and former pastry chef for Amelie's, who avers that she "has never seen a recipe with the combination of the ingredients [that Amelie's uses] in [its] Salted Caramel Brownie," and specifies that a "secret ingredient" gives Amelie's salted caramel brownie its "distinguishing taste" and separates it from its competitors (Doc. 48, ¶¶2, 4-7, 10, 15; see also Doc. 48-2). The plaintiff states that it protects its secret recipes by requiring employees to execute confidentiality agreements and, on the rare occasions that it divulges its recipes to the public, it withholds at least one key "secret" ingredient (Doc. 5, ¶¶12, 13).[12]

The plaintiff argues that the defendants are misappropriating Amelie's salted caramel brownie recipe. Thus, Schade opined, after tasting both parties' brownies, that Sophie's is copying Amelie's salted caramel brownie recipe (Doc. 48, ¶¶15, 16). Specifically, Schade opined that they look the same; they both have the "same unique" texture; and both have the

---

[12]Moreover, the plaintiff argues that the defendants recognized the value of the plaintiff's recipes and techniques, as evidenced by their attempt to purchase the plaintiff's know how (Doc. 2, p. 22). However, the plaintiff provides no legal authority that this circumstance has any bearing on whether the recipe is legally a trade secret.

same taste, which Schade "attribute[s] to ... the secret ingredient" (id., ¶¶13-16; Doc. 48-2).

The defendants controvert that Amelie's salted caramel brownie recipe is a trade secret because the plaintiff allowed publication of the recipe in Charlotte Magazine (which also is on the internet) (see S-1, ¶6; Ex. C). The plaintiff argues that its recipe remains a trade secret because it withheld from the published salted caramel brownie recipe "one key secret ingredient" (see Doc. 2, p. 22; Doc. 5, ¶13). Therefore, the uniqueness of this one ingredient is seemingly dispositive of whether Amelie's salted caramel brownie recipe is a trade secret (see also Doc. 48-2)(the secret ingredient separates the Amelie's salted caramel brownie from its competitors).

The plaintiff has identified its alleged secret ingredient in Schade's sealed affidavit (Doc. S-2, ¶¶10, 15). I am unimpressed by the purported uniqueness of this ingredient in a brownie. Significantly, the alleged secret ingredient is included in a caramel brownie recipe that appears on the internet food website, www.epicurious.com, which reprints recipes from Bon Appetit and Gourmet food magazines (see Doc. S-1, ¶5; Ex. B). Thus, Amelie's "secret ingredient" is arguably not so secret.

Furthermore, the defendants dispute that they are misappropriating the plaintiff's salted caramel brownie recipe. Thus, Sophie's executive chef, Miguel Posada, a culinary school graduate with more than twenty years of experience, avers that he does not use Amelie's recipe, but rather "[t]hrough independent research and calling on [his] skills and experience as a pastry chef, a recipe for a salted caramel brownie was developed" for Sophie's (Doc. 53, ¶¶4, 8-11). Additionally, Posada submitted the recipe he uses to make Sophie's salted caramel brownies, and avers that it is not the same as the Amelie's recipe (Doc. S-1, Ex. A). Notably, the plaintiff has not submitted its recipe so that it can be compared to the defendants'.

In sum, there is conflicting evidence regarding whether Amelie's salted caramel brownie recipe is a trade secret, and if the defendants are still using that recipe. Moreover, at this point, the defendants seem to have the better of the argument. Consequently, the plaintiff has presently failed to show that there is a substantial likelihood that it will prevail on its trade secret claim.

## V.

Because, as has just been seen, the plaintiff does not have a likelihood of success on the merits of its claims, it is not necessary to consider the other three factors regarding the entry of a preliminary injunction. Bloedorn v. Grube, 631 F.3d 1218, 1229 (11th Cir. 2001). Nevertheless, those factors also warrant denial of the request for preliminary injunctive relief.

In the first place, the plaintiff has failed to show a substantial threat of irreparable injury in this case. Injury suffered by a plaintiff is "'irreparable' only if it cannot be undone through monetary remedies." Cunningham v. Adams, 808 F.2d 815, 821 (11th Cir. 1987).

The plaintiff relies upon a presumption of irreparable harm that arises in infringement claims (see Doc. 2, p. 23). However, such a presumption does not apply in this case because the plaintiff has not shown a substantial likelihood of confusion. Hi-Tech Pharmaceuticals, Inc. v. Herbal Health Products, Inc., supra, 132 Fed. Appx. 348 at 350 (no presumption of irreparable harm because a substantial likelihood of confusion was not established). Regardless, even if there were a presumption of irreparable harm, the plaintiff must articulate that harm with

some specificity so that it can be balanced against the harm to the defendants.

Similarly, because the plaintiff has not shown a substantial likelihood of prevailing on its trade secret claim, no presumption of irreparable harm applies to the misappropriation claim (see Doc. 2, p. 23). In any event, the plaintiff has not even established that the defendants are misappropriating its trade secret.

The plaintiff also argues that, absent an injunction, it "faces significant challenges in maintaining a distinction between Amelie's and [Sophie's]," and that it "will find it difficult to obtain and enforce license or franchise agreements with other Amelie's proprietors in the future" (id., p. 24). However, the plaintiff's concern about unknown future franchise opportunities is too speculative to constitute a substantial threat of irreparable harm. Further, because the plaintiff has not shown a substantial likelihood of confusion, the plaintiff's concern about damage to its goodwill is improbable. In this regard, the defendants note that many months have passed since the original filing of the motion, and the plaintiff has yet to identify any specific evidence of irreparable harm (Doc. 55, p. 4). Moreover, the threat of future irreparable harm is minimized because the

defendants have ceased most of the conduct the plaintiff seeks to enjoin, and which was most likely to cause confusion.

Furthermore, the plaintiff has failed to articulate any harm it would suffer absent an injunction that would outweigh the harm suffered by the defendants if an injunction is issued. Thus, the entry of injunctive relief would result in concrete harm to the defendants, as they would be required to make additional substantial investments in Sophie's restaurant and to undergo a disruption in its business operations.

The fourth factor typically asks if "granting [a] preliminary injunction will disserve the public interest." See, e.g., E. Remy Martin & Co., S.A. v. Shaw-Ross International Imports, Inc., supra, 756 F.2d at 1530 n.13. The plaintiff argues that the entry of an injunction supports the public interest because it will prevent consumer confusion in the marketplace (Doc. 2, p. 24). However, as indicated, the plaintiff has not established a substantial likelihood of consumer confusion, and much of the conduct which was most likely to cause confusion has been remedied. Therefore, there is nothing about this factor that supports the granting of preliminary injunctive relief.

## VI.

For these reasons, I recommend that the Motion for Preliminary Injunction be denied. This case clearly does not warrant the extraordinary and drastic remedy of a preliminary injunction.

Respectfully submitted,

THOMAS G. WILSON
UNITED STATES MAGISTRATE JUDGE

DATED: MARCH 19, 2012


## NOTICE TO PARTIES

Failure to file written objections to the proposed findings and recommendations contained in this report within fourteen days from the date of its service shall bar an aggrieved party from attacking the factual findings on appeal. 28 U.S.C. 636(b)(1).